**SO ORDERED**

**SIGNED this 1 day of December, 2025.**

_____
**Pamela W. McAfee**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:

JORDAN REESE CLARK
KADRI CLARK

DEBTORS

CASE NO.
25-00984-5-PWM
CHAPTER 7

### ORDER ALLOWING BANKRUPTCY ADMINISTRATOR'S MOTION TO DISMISS

Among the issues to be decided by the court in this opinion is the novel question of whether the proceeds from the sale of cryptocurrency must be included in a chapter 7 debtor's calculation of current monthly income for purposes of the means test. After careful evaluation, the court concludes that the answer to that question is "yes." In this case the court was also called upon to determine whether this chapter 7 case constitutes an abuse under the totality of the circumstances, which the court concludes must also be answered "yes."

The matter before the court is the amended motion to dismiss this case for abuse filed by the United States Bankruptcy Administrator for the Eastern District of North Carolina (the BA) on August 29, 2025, D.E. 52, in supplementation of his original motion filed on June 11, 2025, D.E. 31. In his motion, the BA contends that dismissal of this case is appropriate pursuant to 11 U.S.C. § 707(b)(2) because the debtors' banking and cryptocurrency records establish that they

did not properly calculate their current monthly income (CMI), and that their actual monthly income exceeds the applicable median income for a family of five such that there is an unrebutted presumption of abuse. Separately, the BA also seeks dismissal pursuant to § 707(b)(3), contending that the totality of the circumstances likewise demonstrates abuse. D.E. 52 at 14-15, 17-18.

Responding in opposition to the original motion, the debtors contend that the BA's inclusion of cryptocurrency sale proceeds in the debtors' CMI is improper and would represent an unprecedented "sea change" in chapter 7 jurisprudence, such that the motion should be denied. D.E. 37. A hearing took place in Raleigh, North Carolina on October 14, 2025, after which the court took the matter under advisement. After full consideration, and for the reasons that follow, the motion will be allowed under § 707(b)(2) and § 707(b)(3).

## PROCEDURAL BACKGROUND

Jordan Reese Clark and Kadri Clark filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on March 18, 2025. The BA filed a notice of presumed abuse on May 13, 2025, D.E. 24, together with a motion for production of documents pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, D.E. 23. After review of those documents, including those pertaining to pay, banking information, business entities, and real estate closings, the BA filed a motion to dismiss the case for abuse pursuant to 11 U.S.C. §§ 707(b)(2) and (b)(3) on grounds that the Clarks did not accurately state their income on Official Form 122A-1, that there was an actual presumption of abuse in the case, and that the totality of the circumstances demonstrated abuse. D.E. 31. It is the BA's position that the Clarks are above median debtors, not below median as claimed on their petition, and that their statutory means test results in a presumption of abuse. The Clarks responded to the motion with a request that it be denied and for a hearing, D.E. 37, which

was set for July 30, 2025. D.E. 38. The hearing was subsequently continued and, as noted above, conducted on October 14, 2025.

Prior to the scheduled hearing, the BA conducted a Rule 2004 examination of the Clarks at which the BA requested, and the debtors agreed to provide, additional documents including bank statements and records pertaining to the acquisition and sale of cryptocurrency. D.E. 52, ¶ 10. The BA subsequently filed an amended motion to dismiss in which he expanded upon the bases for dismissal set forth in his original motion, contending that a review of the Clarks' banking and cryptocurrency records demonstrates that the Clarks had not properly calculated their total household income for the means test. Specifically, he maintains that the Clarks actually received income totaling $119,176.25 during the relevant six-month period, resulting in CMI of $19,862.70, as opposed to the $4,742.97 listed on Official Form 122A-1. D.E 52 at 14. As explained below, the BA's calculations include the proceeds from the sale of cryptocurrency, which he contends must be included in the calculation of "all income" received by the debtors. In addition, the BA cites what he characterizes as unreasonable budgeting, extravagant spending, inaccurate schedules, and other markers of bad faith in support of his alternative motion to dismiss pursuant to § 707(b)(3). *Id.* at 15-18.

The Clarks dispute the BA's contention that proceeds from the sale of assets – specifically, cryptocurrency – within the means testing period constitute income for the purpose of calculating CMI. At the hearing, the Clarks advanced the novel argument that cryptocurrency itself does not constitute a saleable asset, and is not an asset at all in the traditional sense of the word, because it is simply legal tender that can be distinguished from cash only in the same way that dollars can be distinguished from, for example, euros. The Clarks also contend that there is nothing lavish about their spending and that the case does not constitute an abuse under either statutory provision.

3

## JURISDICTION

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a statutorily core proceeding under 28 U.S.C. § 157(b)(1) that this court is authorized to hear and determine. The United States District Court for the Eastern District of North Carolina has referred this case and this proceeding to this court under 28 U.S.C. § 157(a) by its General Order of Reference entered on August 3, 1984. This proceeding is constitutionally core, and this court may enter final orders herein. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## EVIDENCE BEFORE THE COURT

The petition reflects and Mr. Clark testified during the October 14, 2025 hearing[1] that the Clarks are self-employed realtors who operate a real estate business, TCT Property Group, with Mr. Clark as the 100% owner. The Clarks have three children ages 10, 8, and 6. Prior to the bankruptcy filing, Mr. and Mrs. Clark operated their real estate business as The Clark Team.[2] That business was very successful in 2021 and 2022, during which time they were making "half a million dollars a year" and employed 18 individuals including five salaried employees plus commissioned real estate agents. Hrg. at 36:19 – 36:32. The Clarks' real estate business markets to affluent buyers, selling homes in the range of $500,000 and up in western Wake County. Mr. Clark attributes some of their success to marketing and client retention efforts including taking

---

[1] The procedural and factual history set forth in this order is based on the debtors' petition and schedules, Mr. Clark's testimony, and the BA's admitted exhibits from the October hearing. The audio recording of the hearing is available at D.E. 59, and testimonial evidence is cited as "Hrg. at [time from commencement of hearing]."

[2] Mr. Clark testified that they changed their operational corporate entity to TCT Property Group in March 2025, right around the time of the bankruptcy filing. Hrg. at 29:28 – 31:14.

clients for boat tours and wine tastings on the lake, made possible through a membership in the Freedom Boat Club.

The Clarks purchased their residence and two vehicles and enrolled their three children at Cary Christian School (CCS), a private school operating in Cary, North Carolina, during their very successful years. Specifically, the Clarks own residential real property purchased in 2020 and located in Apex, North Carolina with a stated fair market value of $900,000 (although Mr. Clark testified the value likely would be lower today by approximately $50,000 due to new construction nearby). The Clarks purchased a 2021 GMC Yukon around October 2021, which is driven primarily by Mrs. Clark as their household vehicle, and a 2022 GMC Dodge Ram in February 2022, which Mr. Clark described as his work vehicle. Mr. Clark also began investing in cryptocurrency in 2021 because he "believed in that, it was a good asset class, where I could make a gain on it." Hrg. at 44:49 – 45:25; 1:21:32.

During the year prior to the March 2025 filing, the Clarks took a number of trips that Mr. Clark characterized as less extravagant than in earlier years, including vacations in Kissimmee and St. Augustine, Florida in March 2024; Wilmington, North Carolina in May 2024; Daytona Beach, Florida in May 2024; Carolina Beach/Wilmington in June 2024; Brevard, North Carolina in August 2024; Oak Island, North Carolina in October 2024; Miami Beach, Florida in October 2024; Banner Elk, North Carolina in February 2025; and Great Wolf Lodge in Concord, North Carolina, in March 2025. *See* Ex. 4. These trips, with the exception of the trip to Miami Beach, were family outings that included the Clarks' children. Mr. Clark testified that the family stayed at his father's timeshare in Daytona, at a friend's beach house in Wilmington, and at a friend's house in Boone, thereby limiting the cost of lodging. During the six months preceding the Clarks' filing (from October 12, 2024 to March 18, 2025), the listed "vacation spending" entries itemized on their bank

records total $2,628.51.[3] Ex. 4. Also during this time the Clarks' recurring expenses reflected on their bank records included water delivery; a Wild Alaskan, Inc. seafood subscription service; alcohol purchases at Total Wine and Wake County ABC stores; ICP Team Attraction Gymnastics events involving the Clarks' children; concert tickets; purchases at Best Buy; and maintenance services for a hot tub; as well as the $330 monthly membership fee for the Freedom Boat Club identified in their business bank records. Exs. 4, 5, 6.

Mr. Clark testified that the bankruptcy filing was precipitated by loss of income and the pressure of increasing interest rates on their substantial debts, with that loss of income attributable in large part to a significant reduction in home sales both locally and across the country. Mr. Clark testified that 2024 saw the lowest recorded home sales in the United States in 30 years, and that 2025 has been even worse. Although Mrs. Clark is also a realtor, she is currently working as Mr. Clark's assistant (his former assistant having been let go in an effort to reduce business costs). Although few of the recurring expenses listed above were reduced, Mr. Clark did testify that the private school attended by their daughters worked with the Clarks to reduce their tuition, and the evidence showed that he began selling his cryptocurrency in July 2024 to make up for cash flow shortfalls, with the proceeds used for household (not business) expenses such as paying the mortgage and feeding the family. Mr. Clark testified that he was able to remain current on his mortgage and car payments only by using the cryptocurrency proceeds to pay those obligations.

The Clarks began to consider bankruptcy relief roughly four to six months prior to their March 18, 2025 filing date, at a time when they were "faced with paying our mortgage, or paying debt service at 30% interest rates." Hrg. at 19:00 – 19:44. He testified that the "major thing was the debt service on the credit cards that we had; that we had to try to keep our business afloat and

---

[3] This total includes amounts spent at grocery stores away from the Clarks' residence, as well as more traditional travel expenses such as airfare and lodging.

retain our long tenured employees." Hrg. at 19:30 -20:13. The Schedules reflect that the Clarks' nonpriority unsecured debt totals $309,669.79, of which roughly half is identified as relating to the Clarks' business.  D.E. 1 at 30. Mr. Clark could not recall when they first met with counsel, but the petition shows payment of a $2,300 retainer to counsel on November 14, 2024, roughly four months before filing the petition. D.E. 1 at 41.

The evidence showed that all of Mr. Clark's cryptocurrency was sold prior to the petition date, for total sale proceeds of $90,592 from July to November 2024. Mr. Clark testified that, based upon his own research, he approached the bankruptcy process with an "understanding from reading about bankruptcy cases that you couldn't have any assets upon the date of filing." Hrg. at 47:59 – 48:20. He testified that he was not aware of any repercussions that would occur if he did have those assets, beyond that he "just knew that it's something that needed to take place before the date of filing." Hrg. at 48:20 – 48:35. He also admitted that he testified at the 341 meeting that he had been advised by counsel to "burn through his cryptocurrency before filing," while "at the same time we needed all of those resources to maintain our mortgage, our car payments, our school and groceries." Hrg. at 47:36 – 47:59. Mr. Clark testified further that he recalled his previous testimony at his Rule 2004 exam to the effect that he knew he could not have cryptocurrency when he filed for bankruptcy. Hrg. at 48:50 – 48:59. During the six months prior to filing, Exhibit 3 reflects six separate sales of cryptocurrency totaling $67,674.60 between September 26, 2024 and November 5, 2024.

**Prepetition Income**

The Clarks' Schedule I provides that the debtors do not earn wages, salary, or commissions, and that their combined gross monthly income from operating a business is $14,000, attributed entirely to Mr. Clark. D.E. 1 at 33-34. Mr. Clark noted that it was "pretty easy for us to keep track

of the income that we earn through our company's payment system and through our QuickBooks records that we keep." Hrg. at 31:50 – 32:18.

On their Official Form 122A-1, the debtors calculated their CMI at $4,742.97, annualized to $56,915.64. D.E. 1 at 49-50. That amount is calculated based on gross receipts from operating a business of $12,904.55 minus ordinary and necessary operating expenses of $9,769.35, for a net income from operating a business of $3,135.20, plus gross wages and commissions of $694.45 for Mr. Clark and $486.11 for Mrs. Clark.[4] *Id.* At that amount, the Clarks' income falls below the median income for a family of five in North Carolina, such that there would be no presumption of abuse and no requirement to complete Official Form 122A-2, the expenses portion of the means test applicable to "above-median" debtors.

The BA offered as evidence Exhibit 3, which listed deposits into the Clarks' personal bank accounts during the means testing period. The Clarks stipulated that the $50,501.65 amount shown as business income on page 3 of Exhibit 3 (captioned, INCOME) was in fact income received during the means testing period. Hrg. 56:59 – 59:02. In addition, Mr. Clark received $1,000 in payment of a social betting wager. The stipulated income averages $8,416 per month over six months, which is less than the $14,000 listed in Schedule I but does not account for the nonspecific business expenses deducted in Official Form 122A-1, making it difficult to compare the two numbers. In addition to income from operating the real estate business, $67,674.60 in cryptocurrency sale proceeds were received during the means testing period. Ex. 3.

---

[4] There is no explanation of how the numbers for Mr. Clark were derived, including the operating expenses deducted (which do not equate to the personal expenses identified in Schedule J in either type or amount), but the total gross income from operating a business and small wage or commission amounts equal roughly the $14,000 figure used on Schedule I. The listed amount for Mrs. Clark is apparently the receipt of one real estate commission during the relevant time period divided by six.

From this evidence, the matters in dispute are the accuracy of the income numbers in the schedules and whether the proceeds of the cryptocurrency sold during the means-testing period must be included in the calculation of CMI. The BA contends that deposits to the debtors' bank accounts from September 1, 2024 to February 28, 2025 (the six months used to calculate CMI) total $119,176.25, inclusive of the cryptocurrency proceeds. Ex. 3; *see also* D.E. 52 (BA Mem.), Ex. A.

**Expenses**

The Clarks' schedules list two monthly mortgage payments of $3,150 and $1,972 and two car payments of $1,199 and $888; these amounts, together with other claimed recurring monthly expenses, total $13,969.83. Other scheduled recurring expenses include $250 for a gym membership and $1,715 for private school tuition at CCS for the Clarks' three minor children. D.E. 1 at 35-36. All combined expenses, deducted from the $14,000 net income reported in the debtors' Schedule I, leave disposable monthly income of $30.17. D.E. 1 at 36. These expenses presumably differ from the expenses deducted under the calculation of CMI in Official Form 122A-1, as Schedule J lists personal and household expenses while Official Form 122A-1 describes "ordinary and necessary operating expenses" for calculating net income from operating a business. *Compare* D.E. 1 at 35-36 *with* D.E. 1 at 49.

Focusing on the personal and household expenses, the evidence at the hearing conflicted in some respects with the scheduled expense figures. For example, the private school tuition in Schedule J was listed as $1,715 per month, D.E. 1 at 36, while Exhibit 2, introduced into evidence at the hearing, itemized disbursements to CCS from two separate personal checking accounts with payments made between February 2024 and February 2025 totaling $24,977, or an average of $2,081 per month. Ex. 2. Mr. Clark testified that at the time of filing in March 2025, the Clarks

had an agreement with CCS to "defer our payments due to financial hardship" and that they have "since qualified for financial aid through the school." Mr. Clark was unsure of what amount they were currently paying in tuition and thought it might be $20,000 annually. The Clarks are "still paying back the money that [CCS] gave to us on the deferments." CCS is not listed as a creditor in the Clarks' case, and Mr. Clark did not know how far behind he was in payments to the school. The Clarks intend for their children to continue to attend CCS. Hrg. at 40:20 – 41:44.

In addition, Schedule J reflects no costs for health insurance, D.E. 1 at 36, and Mr. Clark testified at the hearing that they have not had traditional health insurance since September 2024. However, Mr. Clark also testified that they currently have health coverage through WeShare, a faith-based medical cost-sharing program that provides a nontraditional form of reimbursement for some health care claims at a cost of approximately $400 per month – an amount not listed on Schedule J.

The Clarks maintain a membership with Freedom Boat Club at roughly $330 per month, or a cost of approximately $4,444 from March of 2024 through April 2025. Ex. 6. Mr. Clark testified that they use the membership to host clients and prospective clients for tours and wine tastings approximately twice per month, and also use the boat for family purposes about once a month. Mr. Clark considers the boat club membership a "profitable means for us to continue our livelihood." Hrg. at 1:16.

**Assets and Liabilities**

As noted above, the Clarks own their residence in Apex, North Carolina, which they purchased in 2020; the 2021 GMC Yukon Denali; a 2022 GMC Dodge Ram; and a golf cart. D.E. 1 at 10-11. The Clarks are current with the mortgages and payments on both vehicles. In their Schedule C, the debtors listed the net equity in the Yukon at $17,911; the net equity in the Dodge

Ram at $13,052, and the net equity in their home, which is owned as tenants by the entireties, at $250,333. D.E. 1 at 17, 19-21. The Clarks claimed exemptions in the Yukon for the entire amount of equity in the vehicle, and the equity in the Ram, for which Mr. Clark has agreed to pay the trustee, appears to be the only asset available for distribution to creditors. The Clarks listed no additional nonexempt assets in their schedules.[5]

The Clarks' debts are primarily consumer debts. In addition to the debt secured by their home and vehicles totaling $715,454.00, Schedule D, D.E. 1 at 22-24, the Clarks listed general unsecured debt totaling $309,669.79 comprised of a combination of personal and business loans and credit cards. Schedule E/F, D.E. 1 at 25-30. Some of the business obligations list The Clark Team, Inc. as a codebtor. Schedule H, D.E. 1 at 32. Most if not all of the general unsecured debts are scheduled as owed by either Mr. or Mrs. Clark, but not both.

**Cryptocurrency**

Mr. Clark began investing in cryptocurrency in 2021 when his business was at its high point. He started selling the cryptocurrency during the downturn in business to supplement his cash flow and help pay his household bills. There are two components of the cryptocurrency sales that are relevant to the BA's motion: first, whether the sale proceeds received during the six months prior to filing constitute "income" for purposes of calculating CMI, and second, whether the circumstances surrounding the sale are a factor under the totality of the circumstances analysis for purposes of § 707(b)(3). Because of its evidentiary importance in the case, the court sets forth virtually all of the potentially relevant testimony and documentary evidence on the topic of the cryptocurrency.

---

[5] The chapter 7 trustee filed a notice of assets on May 2, 2025, and the clerk issued a notice of deadline of August 7, 2025 to file claims in the case. The claims filed total $330,926.02.

Mr. Clark testified that the reason he purchased cryptocurrency was because he "believed in, that it was a good asset class where I could make a gain on it." Hrg. at 44:50 – 45:25; 1:21:32. Mr. Clark did not testify or otherwise offer evidence of any acquisition or base costs to the cryptocurrency, nor did he testify as to specific gains or losses on the cryptocurrency at any distinct time period. Mr. Clark did not day trade cryptocurrency and instead held it as a long-term investment, selling none of it from the time of his initial purchase in 2021 until 2024.

With respect to the reasons for the sales in 2024, in addition to the explanation outlined above, Mr. Clark testified as follows:

Q: What did you think would happen if you had the cryptocurrency when you filed for bankruptcy?

A: I didn't think anything because I needed it to pay bills so that was, wasn't even a thought that had crossed my mind.

Q: Did you decide that you needed to get rid of the cryptocurrency first or did you need it to pay bills first?

A: I needed it to pay bills.

Q: When did you need it to pay bills?

A: I would still be holding on to it today if I didn't need it to like stay current on my mortgage and car payments, and keeping my kids in the schools they've been in for the last five years.

Q: Did you pay any of your creditors listed in your petition with that cryptocurrency?

A: No it was all about self-preservation at that time.

Q: Do you recall during your 341 meeting that an attorney advised you to burn through the cryptocurrency, instead of finding it online?

A: Yes, I do recall that, yes.

Q: To confirm that your testimony during the 341 meeting was that an attorney advised you to burn through the cryptocurrency?

A: That was going to be a necessary step before the filing, yes. That's correct. And so we were advised that you could take that money and use it to operate your household budget and pay your bills.

Q: And which attorney advised you of that?

A: Mr. Sasser.

Hrg. at 50:22 – 52:22.

The petition reflects total sales of $90,592 in cryptocurrency sold via Coinbase at various times since July 2024. D.E. 1 at 42. With respect to those sales, and according to Mr. Clark's testimony and the BA's Exhibit 3, cryptocurrency proceeds from Coinbase were deposited into Mr. Clark's checking account on six separate occasions during the CMI period between September 26, 2024 and November 5, 2024, for a total of $67,674.60. Ex. 3 at 1. The total amount of cryptocurrency sold in the two years prior to the petition date was $90,592, with those sales commencing in July of 2024. D.E. 1 at 42.

## DISCUSSION

## I.  MOTION TO DISMISS PURSUANT TO § 707(b)(1)

### A.  Standard and Contentions

Section 707(b) of the Bankruptcy Code applies in this case because the Clarks' debts are "primarily consumer debts." Section 707(b)(1) provides, in relevant part,

> [a]fter notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1). Section 707(b)(2)(A)(i) sets forth a formula pursuant to which a case is presumed to be an abuse for purposes of § 707(b)(1), colloquially known as the "means test."

The means test requires debtors first to calculate CMI under a statutory formula. The term "current monthly income" means,

> the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on—(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii).

11 U.S.C. § 101(10A)(A).

Once CMI is established, it is annualized and compared to the median income for a household of the same size in the state. If the debtors' CMI is below the median income, there is no requirement to calculate expenses and there is no presumption of abuse. If the debtors' CMI is above the median income, then debtors must calculate their allowable expenses as reflected on Official Form 122A-2. The net difference establishes whether debtors, in the opinion of Congress, ought to be able to fund payments to creditors (in which case there is a presumption of abuse) or not (in which case there is not).

## B.    Burden of Proof

In general, the party seeking a determination that a case is abusive bears the burden of proof. *In re Williams*, 424 B.R. 207, 210 (Bankr. W.D. Va. 2010) (citing *In re Meade*, 420 B.R. 291 (Bankr. W.D. Va. 2009)). Under *In re Perelman*, 419 B.R. 168, 177 (Bankr. E.D.N.Y. 2009), once a party establishes a prima facie case of abuse under § 707(b)(3), the burden shifts to the debtor to controvert the prima facie case. *Williams*, 424 B.R. at 210-11. The *Williams* court applied a similar burden-shifting standard under § 707(b)(2)(A):

> Thus, if the [United States] Trustee asserts that a debtor has incorrectly stated his expenses on Form 22A and if corrected, the debtor's expenses would yield disposable income that is high enough to raise the presumption of abuse, the burden

of proof rests upon the [United States] Trustee to show the validity of its proposed expenses figures and ultimately that abuse exists. If the [United States] Trustee is able to introduce enough evidence in support of its revised figures that a court, using a preponderance of the evidence standard, could infer the validity of those figures and use them to find that a presumption of abuse arises under § 707(b)(2)(A), then a prima facie case of abuse has been established. Once a prima facie case of abuse under § 707(b)(2)(A) is established the burden of proof shifts to the debtor who, in accordance with § 707(b)(2)(B), must show that "special circumstances" justify the expenses the debtor has claimed on Form 22A. In summary, a prima facie case results in presumed abuse under § 707(b)(2) and the burden is on the Debtor to rebut and to shift the ultimate burden of proof back to the moving party.

*Williams*, 424 B.R. at 211.

Here, the burden is on the BA to show that the Clarks used the incorrect figures, and that if the correct figures are used, a presumption of abuse arises. *See In re Hamilton-Conversano*, No. 17-00128-5-SWH, 2017 WL 4417566, at *4 (Bankr. E.D.N.C. Sept. 28, 2017). The burden then shifts to the Clarks to demonstrate that their figures are correct or that special circumstances exist to rebut the presumption. *Id.* At the latter stage of this burden-shifting analysis, the Clarks shoulder a heavier burden, because the BA must only show that the Clarks' figures are incorrect. The Clarks have a more rigorous task: if they cannot demonstrate the numbers in their Official Form 122A-1 are correct, they must prove new figures under which the presumption still does not arise. This is because debtors exercise more control over evidence that relates to their own income and expenses. *See In re Montalto*, 537 B.R. 147, 149 (Bankr. E.D.N.Y. 2015) ("While it is easy to start and end with the proposition that the burden of proof on a motion to dismiss is on the movant, the facts necessary to prove whether certain expenses are household or non-household are almost entirely within the control of the debtor[.]"); *see also In re Tapply*, 652 B.R. 124, 131 (Bankr. D. Mass. 2023). Here, as discussed more fully below, the Clarks are in possession of information related to the original purchase price of the cryptocurrency and the resulting gain upon liquidation,

which would be relevant to the income calculation if the court accepts the BA's position that the sale proceeds constitute income for purposes of calculating CMI.

### C.    Analysis

The Clarks' Official Form 122A-1 used the figure of $4,742.97 for CMI. D.E. 1 at 49-50. Often debtors who do not have a regular salary will attach a schedule showing actual income numbers for each of the six calendar months prior to the petition date to establish how they arrived at the CMI number, but the Clarks did not do so. Instead, their calculated CMI was based on (1) average monthly commissions of $694.45 for Mr. Clark and $486.11 for Mrs. Clark, (2) average monthly gross receipts from operating a business in the amount of $12,904.55 for Mr. Clark with an average of $9,769.35 in operating expenses (for a net income from operating a business of $3,135.20), and (3) a one-time commission to Mrs. Clark as averaged over six months to result in the amount of $427.21 per month. *Id.*

Using those figures, the Clarks' asserted CMI results in an annualized income of $56,915.64, which is well below the $120,433.00 median income in North Carolina for a family of five. *Id.* Accordingly, they contend that they are below median and that there is no presumption of abuse. Having reached this conclusion, the Clarks did not complete Official Form 122A-2. Unfortunately, the Clarks did not present a hypothetical Official Form 122A-2 at the hearing for the court to consider if the court were to conclude that the CMI was calculated incorrectly, so the court does not have a calculation of allowed expenses (or any indication of the basis for the $9,769.35 in deducted operating expenses on Official Form 122A-1) available to it. Although they were not required to present that evidence, it would have been helpful to the court's final deliberations.

There are two sources of disagreement with respect to the Clarks' calculation of CMI: first, the BA established that the actual income deposited into the Clarks' personal accounts from their business during the six calendar months of September 2024 through February 2025 was $50,501.65 (as stipulated at the hearing by the Clarks), but there is no information to support or refute the $9,769.35 in operating expenses included on the Clarks' Official Form 122A-1 or to indicate whether those expenses were deducted before the deposits into the Clarks' personal accounts.[6] Second, the BA contends that the Clarks should also have included the proceeds received from the sale of cryptocurrency during that same period. Based on the total amount of receipts from the business and from the sale of cryptocurrency, the BA contends that the Clarks actually received $119,176.25 ($50,501.65 in business income plus $67,674.60 in cryptocurrency proceeds plus the $1,000 bet) during the six months prior to filing, resulting in CMI of $19,862.70 and an annualized income of $238,352.40.[7]

The BA contends that the definition of "income" for purposes of calculating CMI is expansive, and is not limited to taxable income or income from labor. The Clarks, on the other hand, contend first that cryptocurrency is not an asset, but simply a form of currency; second, that the proceeds of the sale of any asset is not income; and third, that even if the court were to consider the sale of the cryptocurrency, it should look only to any gain that "happened during the CMI

---

[6] That said, the difference in deducting those operating expenses, or not, without more, does not push the Clarks above the median income and would not create a presumption of abuse ($50,501.65 divided by six and then multiplied by twelve equals $101,003.29). On the other hand, using the gross income figure on Official Form 122A-1 without the deduction of ordinary business expenses would result in above-median income of $174,147.84 ($12,904.55 plus $684.45 in commissions for Mr. Clark plus $913.32 in commissions to Mrs. Clark equals $14,512.32 per month, annualized to $174,147.84). Regardless of whether those expenses are deducted, this analysis indicates that whether or not the cryptocurrency proceeds must be included in the calculation of CMI is determinative of whether the Clarks are above or below median for purposes of the means test.

[7] If the court were to accept the Clarks' CMI calculation of $4,742.87 and add the cryptocurrency sale proceeds received during the six-month period ($67,674.60 averaged over six months equals $5,639.55 per month), their CMI would total $10,382.42, annualized to $124,589.04. That amount would also push the Clarks to above-median income.

period." Hrg. at 10:22 – 12:20. As to this third point, with no actual evidence of what that limited gain would be, or, frankly, even what the overall gain on investment was since its purchase in 2021, the Clarks proposed during opening statements that one option is to calculate the total value realized over the 38 months Mr. Clark held the cryptocurrency and divide by 38, resulting in about $870 of gain per month.[8]

Turning first to the characterization of cryptocurrency as actual currency, as opposed to being an investment vehicle, not only is there no legal authority to support the argument that cryptocurrency is the equivalent of legal tender,[9] but there is no evidentiary support that the Clarks used their cryptocurrency as legal tender. Significantly, Mr. Clark testified that he purchased it as an investment. The evidence also demonstrates that the cryptocurrency was liquidated to U.S. dollars and deposited into the Clarks' bank account, with those funds then used to pay the mortgage and vehicle lenders – lenders that presumably would not accept payment by cryptocurrency. Accordingly, this argument fails both legally and factually.

Having rejected the argument that cryptocurrency is simply a form of legal tender, rather than an asset capable of generating income, the court turns to the question of whether the sale of an asset constitutes "income" for purposes of calculating CMI. Section 101(10A)(A) of the Bankruptcy Code provides that "current monthly income" means the "average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse

---

[8] At that point in the hearing, the court indicated that the case law may not support the idea that only the gain offsetting the investment during the CMI period would be counted, and emphasized the court's need for evidence about the acquisition and use of the cryptocurrency. The court added that argument about how to calculate any specific portion as income would more appropriately be made after the close of evidence.

[9] The only authority provided on the issue was guidance from the Internal Revenue Service, Notice 2014-21, that indicates that the IRS does not consider virtual currency to be legal tender. The court does not find that guidance to be dispositive of the issue but mentions it because there appears to be no guidance from any source finding the opposite.

receive) without regard to whether such income is taxable income, derived during the 6-month period" in question. 11 U.S.C. § 101(10A)(A). The term "income" is not defined in the Bankruptcy Code; however, *Black's Law Dictionary* defines income as "money from one's business, labor, *or capital invested*; gains, profits, salary, wages, etc." *In re Zahn*, 391 B.R. 840, 845 (B.A.P. 8th Cir. 2008) (citing *Black's Law Dictionary* 764 (6th ed. 1990)) (emphasis added).

Under § 101(10A)(A), "the amount at issue must be both 'income' and 'received,'" so "any amount the debtor 'receives' but that is not 'income,' and any 'income' that the debtor does not 'receive' cannot be included in the calculation of CMI." *In re Curcio*, 387 B.R. 278, 282 (Bankr. N.D. Fla. 2008). In *Curcio*, the court determined that "a gain realized on the sale of property *does* constitute income;" however, "the return of capital *does not* constitute income." *Id*. at 284 (emphasis added). Therefore, when assessing whether the proceeds of an asset sale must be included in calculating CMI, the court must first determine whether the amount of the asset sale constitutes a gain or not. That determination requires the court to "withdraw from the gross proceeds an amount sufficient to restore the capital value [of the asset] that existed at commencement." *Id*. The court's approach in *Curcio* therefore aligns with the Supreme Court's definition of "income" as "undeniable accessions to wealth, clearly realized, and over which the taxpayer has complete dominion." *Id*. (citing *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955)).

While review of the taxing authority's definition of income would, at first blush, seem helpful, the Ninth Circuit has rejected any definition of income that involves consideration of tax principles because § 101(10A)(A) expressly provides that CMI is calculated "without regard to whether such income is taxable." *See Blausey v. U.S. Trustee*, 552 F.3d 1124, 1132 (9th Cir. 2009). That court supports an expansive definition that includes all forms of income except for the three

categories of funds specifically excluded by statute. *See id.* at 1133 ("[T]he statute specifically excludes certain payments, such as Social Security payments and payments to victims of war crimes and terrorism, from CMI. 11 U.S.C. § 101(10A)(B). The general rule of statutory construction is that the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded.").

Other courts distinguish the sale of personal assets from those derived from investments, royalties, or gifts. *See, e.g., In re Leach*, No. 08-61028-13, 2009 WL 1010552, at *9 (Bankr. D. Mont. Feb. 26, 2009) (sale proceeds from two "personal, nonbusiness, noninvestment" motor vehicles are not "income" for purposes of CMI as they "are not derived from capital, labor or a combination of both and are not derived from employment, investments, royalties, gifts, and the like. The proceeds are also not replacement income."). This analysis captures realized investment income while avoiding the "sky is falling" argument made by the Clarks that defining income to encompass proceeds from the sale of *any* asset would require a debtor to include the proceeds from the sale of a home if received within the six months prior to filing.

Based on the weight of authority, the court concludes that the gains realized from the sale of an investment asset during the six months prior to filing must be included as "income" for purposes of calculating CMI.[10] This then prompts the question: but in what amount? The only evidence before the court is the total amount of sale proceeds received by the Clarks during the six-month period prior to filing. Although the Clarks argued that only the gain derived during that six months should be counted, they provided no evidence of what the gain might have been if limited to that time period. The court thinks the more appropriate measure is the overall gain from

---

[10] The court acknowledges that the sale of an asset results in nonrecurring income that may not be indicative of a debtor's ability to pay creditors going forward – the stated purpose of the means test. However, the same is true for other sources of income that are indisputably included in the calculation, such as gifts from family members, inheritances, lottery winnings, and bonuses.

the investment, but the Clarks also presented no evidence of what amount was originally invested in cryptocurrency. Accordingly, the court must proceed only with the information before it, which is the total amount received from the sale of cryptocurrency during September 2024 through February 2025: $67,674.60.[11]

Using the BA's figures, as noted above, the Clarks' annualized income is $238,352.40. Even accepting all other calculations of income asserted by the Clarks as accurate, the addition of the cryptocurrency proceeds results in above-median CMI. Allocating the $67,674.60 in proceeds over six months results in an average of $5,639.55 per month. Adding that amount to the Clarks' CMI as calculated in their Official Form 122-A-1 results in CMI of $10,382.52, which annualizes to $124,590.24 – elevating the Clarks to an amount above the applicable $120,433.00 median income.

Accordingly, and absent any further showing, the case is presumed to be an abuse under § 707(b)(1). The "further showing" would be a calculation of applicable expenses. Debtors with an above-median income must complete Official Form 122A-2, which itemizes allowable expense deductions, to determine whether there is a statutory presumption of abuse. Once the deductions are taken, § 707(b)(2)(A)(i) establishes whether the resulting net income results in a presumption of abuse. That section provides:

> (2)(A)(i) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of—

---

[11] In closing arguments, upon questioning by the court as to what evidence it had as to the amount of realized gain, counsel suggested that it was the BA's burden to prove the amount of gain. As noted above, the BA's burden is simply to establish that the number used by the debtors was incorrect, which he did. The burden then shifts to the debtors either to establish that their number was correct or to show special circumstances. Here, the debtors were in exclusive control of the evidence needed to determine the actual amount of gain from the cryptocurrency sale should the court conclude that those proceeds counted as income for purposes of CMI.

(I)     25 percent of the debtor's nonpriority unsecured claims in the case, or $9,075, whichever is greater; or

(II)     $15,150[.][12]

11 U.S.C. § 707(b)(2)(A)(i). In shorthand, if an above-median debtor's CMI minus allowed applicable expenses exceeds $252.50, then the case is presumed to be an abuse.

As noted, the Clarks did not complete Official Form 122A-2, nor did they present a hypothetical Official Form 122A-2 at the hearing for the court to consider in the event it concluded that the CMI was calculated incorrectly. Thus, the court does not have a calculation of allowed expenses available to it. However, it is apparent that using either the income figures established by the BA or the CMI as calculated by the Clarks with the addition of the cryptocurrency proceeds, the expense deductions allowed by statute would almost certainly result in net monthly income of more than $252.50. Consequently, the court finds that the case is presumed to be an abuse under § 707(b)(1), and the BA's motion to dismiss will be allowed with an opportunity for the Clarks to voluntarily convert the case to another chapter.

## II.    MOTION TO DISMISS PURSUANT TO § 707(b)(3)

### A.    Standard and Contentions

Section 707(b)(3) sets forth an alternative basis on which the court may find abuse under § 707(b)(1) where there is no presumption of abuse under the "means test" calculation. It provides, in relevant part,

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—
>
> (B) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances (including whether the debtor seeks to

---

[12] These numbers were adjusted for inflation effective April 1, 2025, but this case was filed prior to that adjustment date.

reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

The Fourth Circuit established the factors that should be considered under the "totality of the circumstances" for determining abuse in *In re Green*, 934 F.2d 568, 572 (4th Cir. 1991). Although *Green* pre-dated the enactment of the current version of § 707(b), its factors continue to inform courts' decisions regarding abuse. *Bankr. Adm'r v. Gregory (In re Gregory)*, 471 B.R. 823, 829 (E.D.N.C. 2012); *see also In re Burks*, No. 1:18-AP-1002, 2022 WL 243929, at *5 (Bankr. S.D. W. Va. Jan. 25, 2022). The factors include:

(1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
(2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
(3) Whether the debtor's proposed family budget is excessive or unreasonable;
(4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
(5) Whether the petition was filed in good faith.

*Green*, 934 F.2d at 572 (citations omitted). Not only have courts concluded that the *Green* factors remain applicable to the revised standard under § 707(b)(3), but courts also find case law applying the prior version of § 707(b) to be persuasive authority. *See In re Lipford*, 397 B.R. 320, 327 (Bankr. M.D.N.C. 2008). In balancing the *Green* factors, courts have recognized that debtors' demonstrated efforts to tighten their budget by, for example, surrendering expensive assets to secured creditors, may show a lack of abuse. *See id.* at 338.

The BA primarily focuses on two of the *Green* factors: whether the proposed family budget is excessive or unreasonable; and whether the schedules and statement of current income and expenses reasonably and accurately reflect the debtors' true financial condition.[13] Based on the

---

[13] The BA's motion also indicated that the Clarks' postpetition income and expenditures are substantial, but there was no evidence presented at the hearing on postpetition income, and the only

23

continuing applicability of pre-2005 cases, the BA cites *In re Walsh*, 287 B.R. 154 (Bankr. E.D.N.C. 2002), as closely analogous to the facts before the court. There, the debtors' substantial monthly expenses included private school tuition of $1,750 per month, country club membership of $240 per month, and hockey fees of $300 per month for their children. *Id*. at 155. Finding substantial abuse, the court held that these expenses "simply cannot take precedence over the debtors' other financial obligations … [I]t would be patently unfair for the debtors to continue to make lifestyle choices that ignore their obligation to creditors." *Id.* at 157-58.

The Clarks, on the other hand, contend that there is nothing lavish or luxurious about their spending; specifically with reference to the *Walsh* case, they note that their private school tuition for three children is roughly the same as what the Walshes were spending back in 2002 – signaling their belief that the amount is insignificant in 2025 dollars; that the Walshes' country club membership had no demonstrated business purpose, unlike the boating club in this case; and that the Walshes' expenses for their children's sports involved expensive travel and equipment, while they are only paying for gymnastics classes. The Clarks contend that even if their budget is above average, it is neither excessive nor unreasonable. The Clarks further contend that their schedules accurately reflect their true financial condition, noting that while the BA identified a few discrepancies, they were not significantly different than the figures the Clarks originally provided.

**Analysis**

<u>Whether the debtor's proposed family budget is excessive or unreasonable</u>

The most significant expense at issue is the private school tuition for the Clarks' three children. Exhibit 2 shows that the Clarks paid $2,451 ($817 per child) per month in tuition to CCS from May 2024-December 2024. Mr. Clark testified that they reached an agreement with the

---

evidence regarding postpetition expenses was Mr. Clark's testimony about a few prepetition expenses that had been eliminated.

school for payment deferrals and for financial aid, but the testimony on this was far from clear. The prepetition payment history was consistent through December 2024, but the January and February 2025 numbers did not align with any identifiable payment pattern. Mr. Clark was unsure of what amount they were paying in tuition as of the petition date, and estimated it as $20,000 annually. As noted, the Clarks intend for their children to continue to attend CCS; however, there was no testimony as to why private school was necessary for their children other than Mr. Clark's stated negative opinion of the public schools in his area.

The BA also identified additional recurring expenses that he characterized as excessive or luxury items, including: water and coffee delivery services; a Wild Alaskan, Inc. seafood subscription service ranging from $150-200/month; alcohol purchases at Total Wine and Wake County ABC stores; ICP Team Attraction Gymnastics events involving the Clarks' children at $291-310/month; concert tickets; purchases at Best Buy; maintenance services for a hot tub; and the $330 monthly membership fee for the Freedom Boat Club. [14]  *See* Ex. 5, 6. Of those and other monthly expenses, the only personal items the Clarks have chosen to forego since deciding to pursue bankruptcy relief is the water delivery, suspension of a couple of streaming services, and substitution of traditional health insurance for a private health cooperative plan. Mr. Clark testified generally that the majority of cuts have been to business expenses.

The kinds of expenses challenged by the BA – private school tuition, children's sports, and private club memberships – have been addressed in numerous cases in addition to *Walsh*. For example, in *In re Stout*, 336 B.R. 138, 143 (Bankr. N.D. Iowa 2006), the court found that a home schooling expense of $700 per month and a $500 per month skating expense for the debtor's child were not reasonably necessary, despite substantial evidence of a historical need for special

---

[14] Notably, the court has only evidence of payments made directly from the Clarks' bank accounts (or through use of a debit card) and no records of payments that may have been made by credit card.

assistance with the child's education and the importance of skating in her life. The *Stout* court held that

> [t]he amounts which Debtor seeks to expend on home schooling and ice skating, while seeking to discharge $95,000 in credit card debt, is an unreasonable use of the bankruptcy system. These are discretionary or luxury expenses, paid from Debtor's disposable income which should be available to creditors in Chapter 13 plan payments. To conclude otherwise would allow the result which the U.S. Trustee argues; that is, allowing Debtor to finance these activities at the expense of unsecured creditors.

*Id.* The court concluded that the debtor could pay a substantial portion of the $95,000 in credit card debt he sought to discharge by trimming his expenses. In *In re Schott*, No. 05-49765-293, 2007 WL 914043, at *4 (Bankr. E.D. Mo. March 23, 2007), the court held that the expense of $505 per month for parochial school tuition for the debtors' three children was not reasonably necessary, that the debtors' $650 monthly life insurance premiums were excessive, and that the expense of $158 per month for soccer camp for the three children was not reasonably necessary.

More recently, the court in *In re Ellison*, 663 B.R. 743, 748 (Bankr. E.D. Mo. 2024), held that expenses of $270 per month for taekwondo classes for the debtor and her family and $194.40 for gym membership for the debtor and her family were not reasonably necessary, and concluded that the chapter 7 case was an abuse under the totality of the circumstances. The *Ellison* court noted that, "[t]he analysis thus turns upon whether the Debtor's expenses are unreasonable and, if those expenses were removed from her proposed budget, whether she would have sufficient disposable income to make substantial payments on her general unsecured debts under a hypothetical Chapter 13 plan." *Id.* at 747. "There is no bright-line test to determine what constitutes substantial repayment under Section 707(b)(3)." *Id.*

As best articulated by Judge Small in *Walsh*, "[t]he court does not want to make lifestyle decisions for debtors. In this instance, however, it would be patently unfair for the debtors to

26

continue to make lifestyle choices that ignore their obligations to creditors." 287 B.R. at 158. Also like Judge Small, this court declines to address every single expenditure challenged by the BA. However, a few items must be discussed: private school tuition, luxury expense items, gymnastics memberships, and boat club membership.

First, and noting the uncertainty of the testimony on this issue, the Clarks spend somewhere between $1,600 and $2,450 per month on tuition for CCS. Mr. Clark testified that they enrolled their oldest daughter at CCS during the pandemic because it remained open – as opposed to other schools that operated only remotely – and they enrolled their younger children there as they became school-aged. There was no additional testimony that any of the children had special requirements best met by private schools; at most, Mr. Clark made evident his negative impression of the local public school.

As noted above, a number of courts have considered private or parochial school tuition not to be reasonably necessary for purposes of § 707(b), at least where the decision is based only on parental preference.

> A mere parental preference to send a child to a parochial school does not make that expense reasonably necessary under the substantial abuse analysis. *In re Rathbun,* 309 B.R. 901, 907 (Bankr. N.D. Tex. 2004). Rather, the debtor must demonstrate that either the local public school system is deficient or that the private school can meet a particular educational need of the child that the local public school cannot. *Watson v. Boyajian (In re Watson),* 309 B.R. 652, 661 (B.A.P. 1st Cir. 2004) *aff'd* 403 F.3d 1 (1st Cir. 2005); *In re Carlton,* 211 B.R. 468, 482 (Bankr. W.D.N.Y. 1997); *In re Jones,* 55 B.R. 462, 467 (Bankr. D. Minn. 1985).

*Schott,* 2007 WL 914043, at *3. Here, there was no evidence that any of the Clarks' children had a particular educational need that could not be met by the public schools. Accordingly, the court cannot find that the private school expense is reasonably necessary under a totality of the circumstances analysis.

Second, the BA identified a number of items that, taken collectively, constitute luxury expenses. Those include a subscription seafood delivery service, substantial purchases of wine and liquor, concert tickets, and – while presumably not extravagant by comparison to their prior lifestyle – a number of family vacations.

> Courts expect that "the budgeted expenses of a debtor seeking relief under the Bankruptcy Code would reflect some belt tightening—some reduction from prepetition levels." [*In re*] *Reeves*, 327 B.R. [436, 446 (Bankr. W.D. Mo. 2005)]. This does not mean that a debtor must forgo life's necessities, but a debtor who continues to spend at pre-petition levels on luxury items or discretionary expenses puts a Chapter 7 case at risk of dismissal. *See In re Gourley*, 549 B.R. 210, 219-21 (Bankr. N.D. Iowa 2016).

*In re Ellison*, 663 B.R. 743, 747-48 (Bankr. E.D. Mo. 2024). Here, as noted, Mr. Clark testified that few of their efforts to reduce costs were made from their personal expenses; instead, he testified generally that those cuts were made at the business level. There were few specifics offered.

The BA also contends that the boat club membership is excessive. On this issue, however, Mr. Clark testified persuasively that he frequently takes clients on evening boat tours, and that those outings have resulted in repeat business and are a lucrative business development tool. Although the Clarks also enjoy the boat membership for personal outings, it appears to the court to be a reasonably necessary expense to maintain Mr. Clark's income as a real estate agent.

Similarly, the court does not find the retention of the expensive vehicles to be unreasonable because they were purchased when the payments were well within the Clarks' means, at least one of them is used to generate income, and replacing those vehicles now would likely result in similar monthly payments. And, as the Clarks noted during closing arguments, surrendering those vehicles is not required and would leave those secured creditors with claims as well.

28

On balance, however, the court finds that continuing the private school tuition, the seafood and wine and liquor expenses, the gymnastics fees, concert tickets and trips, while choosing to discharge over $300,000 of debt, demonstrates an unwillingness to tighten the budget and is not consistent with the goal of the Bankruptcy Code to provide a fresh start to the truly needy. Allowing the Clarks to proceed in chapter 7 without any effort to reduce these expenses is the equivalent of their financing these activities at the expense of unsecured creditors.

<u>Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition</u>

As noted above in preceding sections, the BA contends that Clarks' schedules and statement of income were internally inconsistent.[15] As the BA notes, the Clarks "identified an income of $14,000 on Schedule I, and expenses of $13,969.83 on Schedule J. In asserting that their current monthly income was just $4,742.97, the Debtors suggest their average pre-petition income would cover just 33.9% of their monthly expenses." D.E. 52 at 14 n.1.

Likewise, evidence of expenses presented by Mr. Clark at the hearing conflicted in meaningful ways with the expenses recited in the Clarks' schedules and statement of current income and expenses. Examples of this include the mismatch between the private school tuition claimed in Schedule J at $1,715 per month, compared to the average monthly cost of $2,081 derived from the Clarks' separate personal checking accounts as offered into evidence by the BA. Ex. 2. Mr. Clark testified to current health insurance costs of approximately $400 per month but also testified that the family had been without health insurance since September of 2024. Health insurance costs are listed as $0 in the Clarks' Schedule J. D.E. 1 at 36. Similarly, the evidence

---

[15] The BA's primary contention regarding the Clarks' reported income was the omission of the cryptocurrency proceeds, but those sales were disclosed on the SOFA and, absent ongoing sales, those would not typically be listed in Schedule I. The court has already addressed that those proceeds should have been included in the calculation of CMI, but that issue alone does not also warrant a finding of inaccurate schedules.

established a recurring Freedom Boat Club membership with a monthly fee of approximately $330, but that expense does not appear in the Clarks' schedules. Although the boat club fee appears to be paid from one of the Clarks' two business accounts, suggesting it is distinctly a business expense, at least one of those accounts was also used to pay the family's vacation costs. Ex. 4 at 2.

In addition, as detailed above, the Clarks' Official Form 122A-1 established Mr. Clark's monthly income from operating a business by listing gross receipts of $12,904.55 and deducting $9,769.35 in operating expenses (for a net income from operating a business of $3,135.20), while Schedule I lists average monthly net income from operating a business of $14,000 with personal and household expenses of $13,969.83 itemized in Schedule J, for a net monthly income of $30.17. D.E. 1 at 33-36. There is insufficient information to reconcile the net income *before* personal household expenses of $3,135.20 on Official Form 122A-1 with the listed $14,000 in net income from operating a business and $13,969.83 in expenses on Schedules I and J. Perhaps if the Clarks had included the statement requested in line 8a of Schedule I "showing gross receipts, ordinary and necessary business expenses, and the total monthly net income" to explain the basis for the $14,000 figure, the court would have fewer questions. But they did not.

Inconsistencies like these undermine the fundamental purpose of a debtor's schedules, which is to provide accurate information regarding a debtor's true financial condition. Here, the court cannot conclude with the requisite level of confidence that the schedules and statements as presented satisfy the requirement that they "reasonably and accurately reflect the true financial condition" of the debtors. *See In re Green*, 934 F.2d 568, 572 (4th Cir. 1991).

At the hearing, the Clarks argued that it is difficult to "get the numbers exactly right" when a debtor is self-employed, and that they stipulated to the number reached by the BA and contend that the BA's figure is "within the range" of the gross business income listed in Official

Form 122A-1 and in Schedules I and J. However, as noted, the "gross" business income on Official Form 122A-1 is $12,904.55, while the "net" business income on Schedule I is $14,000, and those figures simply cannot both be correct. With conflicting income numbers and inconsistent expense numbers, the court cannot find that that the Clarks' schedules and statements accurately reflect their true financial condition.

<u>Whether the petition was filed in good faith</u>

The BA focused more on other aspects of the analysis than on the "good faith" component of the totality of the circumstances, but two issues that fall within the umbrella of good faith cannot go without comment: first, the testimony regarding the sale of cryptocurrency in anticipation of filing bankruptcy, and second, the timing of the change in Mr. Clark's business entity.

Earlier in this opinion the court detailed almost all of the evidence regarding the sale of the cryptocurrency. The court was greatly concerned by Mr. Clark's testimony that he was advised by counsel to "burn through" his cryptocurrency before filing, but Mr. Clark also testified that he had been selling the cryptocurrency to help pay his bills for some time. The SOFA supports Mr. Clark's testimony that he began selling the cryptocurrency in July – well before he met with counsel. In addition, it was also evident that Mr. Clark did not understand that the reason he might have been advised to "burn through it" was to avoid administration by the trustee. So, while the court frowns on and frankly is quite troubled by advice to deplete a bankruptcy estate before filing, and particularly in this case where that advice *may* have caused the Clarks to fail the means test (assuming Mr. Clark would not have sold a substantial amount of the cryptocurrency without that advice), the court does not find this to be a factor of weight in its analysis of whether the totality of the circumstances demonstrate abuse. Other facts might lead the court to a different conclusion in a different case.

There was little discussion of the second issue other than Mr. Clark's testimony that his real estate business operated as The Clark Team until shortly before the bankruptcy filing, at which time he created TCT Property Group. The schedules show that The Clark Team was co-obligated on most or all the debt denominated as "business debt." *See* Schedule H, D.E. 1 at 32. By changing the corporate entity around the same time as the bankruptcy filing, a discharge of the Clarks individually effectively cuts off all routes for collection by these creditors. Absent the corporate change, The Clark Team would generate income through the business's share of postpetition commissions; instead, those funds now go to TCT Property Group, an entity not liable on the business debt. Accordingly, the creditors that enabled The Clark Team's operations have no recourse against any postpetition commissions. Had The Clark Team continued operating and paid even some portion of the debts on which it is co-obligated, the Clarks' personal liabilities would be reduced by as much as one half. This fact may not be sufficient on its own to demonstrate a lack of good faith or abuse, but it is one item on the scale that tips against the debtors.

In summary, based upon all the foregoing, the court finds that the totality of the circumstances demonstrate abuse. There are several enumerated expenses that, taken collectively and in the context of an effort to discharge over $300,000 in general unsecured debt, are unreasonable. There is no meaningful effort on the debtors' part to adjust a very comfortable lifestyle to try to pay creditors. The schedules do not reflect a full and accurate picture of the Clarks' financial circumstances, and, to the extent that the court does have the necessary information and insight, the resulting picture tips the scales toward bad faith.

## CONCLUSION

For the foregoing reasons, the court concludes both that the Clarks' calculation of CMI is inaccurate due to the omission of the cryptocurrency sale proceeds, the inclusion of which creates

an unrebutted presumption of abuse, and that the totality of the circumstances in this case demonstrates abuse. Accordingly, the BA's amended motion to dismiss the case for abuse is ALLOWED under both 11 U.S.C. § 707(b)(1) and § 707(b)(3). The Clarks may convert their case to another chapter within 14 days of the date of this order, failing which the case will be dismissed.

**END OF DOCUMENT**